UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HEALIX INFUSION THERAPY, INC., | § § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2072 |
| | § | |
| HELIX HEALTH, LLC, and | § | |
| STEVEN MURPHY, | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Healix Infusion Therapy, Inc. ("HIT") filed this breach of contract

action against Defendants Helix Health, L.L.C. and Steven Murphy (collectively

"Defendants") alleging that Defendants breached a settlement agreement with HIT.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, 1338

and 1367, and Defendants have consented to enforcement of the settlement agreement

in the Southern District of Texas.[1]

This case was tried to the Court on September 23 and 24, 2010.[2]  Each party

presented exhibits and live witnesses.  Having considered the evidence introduced by

the parties, all matters of record in this case, the arguments of counsel and applicable

---

[1]     Plaintiff's Exhibit ("PX") 3 ("Settlement Agreement") ¶ 19

[2]     The parties waived the right to a jury trial.

authorities, the Court makes the following findings of fact and conclusions of law.[3]

## I.  <u>BACKGROUND</u>

This litigation arises out of a prior case resolved by a settlement agreement between the parties.  HIT provides "drug compounding, infusion therapy and practice management services to physicians."[4]   HIT filed suit in January, 2008 against Defendants Stephen Murphy, a medical doctor specializing in internal medicine and genetics, and his business entity Helix Health, L.L.C, for cybersquatting and trademark infringement (the "Underlying Litigation").   In that case, HIT's cybersquatting claim was adjudicated on summary judgment in favor of Defendants, and HIT's trademark infringement claim was dismissed without prejudice for lack of personal jurisdiction.  On May 1, 2009, while the Underlying Litigation was on appeal to the Fifth Circuit, the parties entered into a settlement agreement (the "Settlement Agreement").[5]

The basic terms of the Settlement Agreement were:  (1) HIT paid Defendants $7,500.00; (2) HIT withdrew its appeal of the Underlying Litigation; (3) HIT agreed

---

[3]    The Court explains the evidence and uses various forms of the word "find" to indicate a finding of fact, and sets forth legal principles and uses forms of the words "hold" and "conclude" to indicate a conclusion of law.  To the extent a finding of fact is more properly a conclusion of law, and to the extent a conclusion of law is more properly a finding of fact, it should be so construed.

[4]    Plaintiff's First Amended Motion for Summary Judgment [Doc. # 49], at 1–2.

[5]    *See* PX 3.

not to bring suit against Defendants for prior acts of trademark infringement; and (4) Defendants agreed (a) to abandon their trademark application for "HELIX HEALTH" within three days; (b) to provide HIT with a list of domain names previously used to market "Helix Health"; (c) to transfer ownership of the aforementioned domain names to HIT within thirty days (by May 31, 2009); (d) to cease using "Helix Health" within thirty days; and (e) to change Defendants' corporate name within six months (by November 1, 2009).  Defendants were, however, permitted to use the following corporate identifiers:  "Helix Health of Connecticut", "Helix Health of Delaware", and "Helix Health of New York".[6]

HIT commenced the suit at bar on July 2, 2009, alleging that Defendants have continued to use the identifier "Helix" in violation of the Settlement Agreement.  HIT asserted claims for breach of the Settlement Agreement and for trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114, 1125.  HIT seeks specific performance of the Settlement Agreement, damages, a permanent injunction, and attorney's fees.  Defendants, alleging that HIT intercepted emails intended for Dr. Murphy following the domain transfer, assert counterclaims for breach of the Settlement Agreement, invasion of privacy, violations of the Federal Wiretap Act, 18 U.S.C. § 2520, and violations of the Federal Stored Communications Act, 18 U.S.C.

---

[6]    *Id.*

§ 2707.

On January 19, 2010, Defendants agreed to a preliminary injunction [Doc. # 43] enjoining them from using the prohibited marks in any manner outside the terms of the Settlement Agreement.  In March 2010, HIT moved for summary judgment on its breach of contract and trademark infringement claims, as well as Defendants' counterclaims.  Defendants moved for partial summary judgment on HIT's claims. On August 12, 2010, the Court denied HIT's motion for summary judgment, while granting in part and denying in part Defendants' motion [Doc. # 71].

On September 8, 2010, the parties stipulated [Doc. # 82] that HIT abandoned with prejudice its claim for trademark infringement and Defendants dismissed with prejudice their counterclaims for breach of contract, invasion of privacy, and violations of the Federal Stored Communications Act, 18 U.S.C. § 2707.  The only remaining claims became HIT's cause of action for breach of contract and Defendants' counterclaim for violations of the Federal Wiretap Act, cited as 18 U.S.C. § 2520.[7]  The case proceeded to trial.[8]

---

[7]     Defendants actually rely on 18 U.S.C. § 2511.

[8]     At trial, Plaintiff submitted a "Motion for Judgment on the Pleadings," seeking to dismiss Defendants' Federal Wiretap Act counterclaim.  This Motion was untimely and was never filed in the record by HIT.  The Court treats the document as an informal trial brief.

II.     **BREACH OF CONTRACT**

A.     **Legal Principles**

The construction and enforcement of the provisions of a settlement agreement are governed by Texas contract law. *Eastern Energy, Inc. v. Unico Oil & Gas, Inc*., 861 F.2d 1379, 1380 (5th Cir. 1988); *Lockette v. Greyhound Lines, Inc.*, 817 F.2d 1182, 1185 (5th Cir. 1987) (holding that in diversity cases, state law controls validity and interpretation of settlement agreements). The elements of a breach of contract are (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages sustained by the plaintiff as a result of the breach. *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.).

When a trademark infringement plaintiff has entered into a settlement agreement releasing its claim, what it bargained for was "the peaceable enjoyment of its trademark, without conduct that would infringe on that trademark." *Qaddura v. Indo-European Foods, Inc*., 141 S.W.3d 882, 891–92 (Tex.App.—Dallas 2004, pet. denied). When that agreement is breached, plaintiff suffers injury to the goodwill of its mark sufficient to succeed under a breach of contract action. *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, No. H-05-3227, 2006 WL 1984592, at *8 (S.D. Tex. July, 14 2006), *vacated in part on other grounds* 518 F.3d 321 (5th Cir. 2008) (citing *Blue*

*Cross and Blue Shield Ass'n v. Am. Express Co.*, No. 99 C 6679, 2005 WL 1838340 at *5-6 (N.D.Ill.2005); *Alfred Dunhill, Ltd. v. Dunhill Compact Classics, Inc.*, 11 U.S.P .Q.2d 1078, 1080 (C.D.Cal.1988)).

## B.   Analysis

There is no dispute and the Court finds that the Settlement Agreement, dated May 1, 2009, constitutes a valid contract.  The Court further finds that Plaintiff, HIT, performed under that contract.  The Settlement Agreement required HIT (1) to pay Defendants $7,500.00 in settlement funds,[9] (2) to withdraw its appeal of the Underlying Litigation,[10] and (3) not to bring suit against Defendants for acts of trademark infringement prior to May 1, 2009.[11]  HIT complied with these provisions. HIT paid Defendants $7,500.00 on April 13, 2009.[12]  HIT dismissed its appeal of the Underlying Litigation.[13]  There is nothing in the record to suggest HIT brought suit against Defendants for trademark infringement for Defendants' conduct prior to the Settlement Agreement.   Thus, the Court finds that HIT performed under the Settlement Agreement.

---

[9]     Settlement Agreement, ¶ 10.

[10]     *Id. ¶* 6.

[11]     *Id.* ¶ 9.

[12]     PX 5.

[13]     PX 4.

The Court further finds that Defendants breached the Settlement Agreement. Paragraph 2 of the Settlement Agreement (the "Cessation of Use clause") required Defendants to cease using certain trademarks or names by specified deadlines. In particular, Defendants promised to cease using "Helix" and "Healix" within thirty (30) days, that is, by May 31, 2009.[14] After that date, Defendants were permitted to use only "Helix Health of Connecticut," "Helix Health of Delaware," and "Helix Health of New York."[15] The Cessation of Use clause also required Defendants to change the corporate name "Helix Health L.L.C." within six (6) months, by November 1, 2009.[16]

The Court finds that Defendants did not comply with the Cessation of Use clause in the Settlement Agreement. The record contains numerous examples of Defendants' use of "Helix" and "Healix" after May 31, 2009. As of November 19, 2009, a "LinkedIn" profile for "Steve Murphy" listed him as the "Managing Partner/Founder at Helix Health."[17] As of December 20, 2009, "Medpedia," a Wikipedia-like website for the medical profession, listed Steven Murphy, MD as the "Managing Partner" of "Helix Health PLLC."[18] As of December 21, 2009, the New

---

[14]     Settlement Agreement ¶ 2.

[15]     *Id.*

[16]     *Id.*

[17]     PX 10.

[18]     PX 18.

York State Doctor Profile for Steven Murphy listed his offices as "Helix Health and Medicine" in "New York, NY" and "Helix Health" in "Greenwich, CT."[19]

The Court issued an agreed preliminary injunction on January 1, 2010 [Doc. # 43]. Nevertheless, Defendants continued to use the prohibited marks. As of August 6, 2010, Dr. Murphy was still posting to a blog with the username "helixhealth."[20]

The record also reflects that Defendants failed to prevent others from impermissibly associating Defendants with Plaintiff's trademark as required by the Settlement Agreement. For example, on September 29, 2009, Coriell Institute, a non-profit biomedical research institution, issued a press release indicating it had established a partnership with, *inter alia*, "Helix Health."[21] A brochure for an October 1–2, 2009 medical conference at Ohio State University listed as a participant "Steve Murphy, MD, President Healix Health and The Gene Sherpas, Stamford CT."[22] As of December 13, 2009, a website for a DNA testing corporation, "genelex," advertised

---

[19]     PX 21.

[20]     PX 37.  As of August 25, 2010, Defendants had deleted this blog account.  *Id.*

[21]     PX 7, at 2.  This partnership continued to be advertised on the Internet as of December 17, 2009.  PX 15.  Dr. Murphy claimed to have notified Coriell not to use "Helix," but he did not recall the date of notification and he did not provide any copies of any email or communications during the trial.  The Court finds Dr. Murphy did not make timely or effective efforts in this regard.

[22]     PX 8.

a partnership with "Helix Health."[23]  On April 9, 2010 and May 27, 2010, Steven

Murphy received emails at "steven.murphy@helixhealth.org."[24]  In March 2010,

Andrew Camel, who had interned with Defendants, listed on a blog advertising his

web-design services, a "Helix Health" email address where he could be reached.[25]  As

of August 9, 2010, the Greenwich Physicians Association continued to list Dr. Steven

Murphy as being located at "Helix Health LLC."[26]  Where Dr. Murphy contends these

uses were without his knowledge or permission, the Court finds that Defendants

continued to use the "Helix" marks in violation of the Settlement Agreement by not

adequately or timely informing Coriell, Ohio State University, genelex, senders of

emails, the blogger, and the Association about the name change.  Dr. Murphy did not

affirmatively send any written communications and did not confirm in writing any

oral instructions he may have given.  Any efforts he made to cure the repeated

breaches of the Settlement Agreement came only after HIT had informed him of his

errors.[27]  He also presented no evidence that any instructions he may have given were

---

[23]     PX 14.

[24]     PX 48.

[25]     PX 35.

[26]     PX 36.

[27]     HIT sent Defendants' counsel letters in December 2009 informing Defendants of
        breaches to the Settlement Agreement.  *See* PX 13, 16, 19.  Defendants' evidence shows
        that his efforts to cure these breaches did not occur until  December, 2009, after HIT's
        letter, and well past the May 31 deadline in the Settlement Agreement.  *See, e.g.*, DX 3,

clear, firm, or timely.

Additionally, the Court finds that Defendants did not change the corporate name of "Helix Health" by November 1, 2009 as required by the Settlement Agreement. As of December 4, 2009, Defendants were still operating in Connecticut under the name "Helix Health" with no geographic modifier as had been required under the Agreement.[28]  In Delaware, Defendants continued to operate under the name "Helix Health" until December 14, 2009.  On December 16, 2009, an email notification of a deposit payment was sent from United Health Care to "Helix Health," indicating that Defendants had not changed the corporate name in their dealings with "third party payors" as required by the Settlement Agreement.[29]  Similarly, as of December 24, 2009, the organization associated with Dr. Murphy's NPI number was still listed as "Helix Health LLC."[30]  As of December 31, 2009, the Stamford Chamber of Commerce still listed a healthcare business by the name of "Helix Health LLC" with Steven Murphy as a partner,[31] and the Greenwich Hospital Physicians Directory

---

7, 8, 10, 12, 13.  Furthermore, some breaches were not cured by Defendants until August, 2010.  *See, e.g.* DX 20, 24, 29.

[28]     PX 11.

[29]     PX 22.

[30]     PX 25.

[31]     PX 27.

continued to list "Helix Health LLC" as the office of Dr. Steven Murphy.[32]  The Court finds accordingly that Defendants did not change the corporate name within the deadline required by the Settlement Agreement.  Because Defendants did not comply with either deadline in the Cessation of Use clause, the Court finds that Defendants repeatedly breached the Settlement Agreement.

The Court finds that HIT suffered injury in denial of its exclusive use of the marks for which it had bargained in the Settlement Agreement.  However, HIT has not shown calculable monetary damages associated with Defendant's continued use of HIT's marks in violation of that Agreement, and no money damages are awarded.  *See e.g. Am. Rice, Inc. v. Producers Rice Mill, Inc.*,No. H-05-3227, 2006 WL 1984592, at *8 (S.D. Tex. July, 14 2006), *vacated in part on other grounds* 518 F.3d 321 (5th Cir. 2008) (awarding no money damages for breach of settlement agreement not to use trademark); *Qaddura v. Indo-European Foods, Inc*., 141 S.W.3d 882, 891-92 (Tex. App.—Dallas 2004, pet. denied) (awarding trademark infringement remedies for breach of settlement agreement not to use trademark where there was proof of lost profits).[33]

---

[32]    PX 28.  Again, to the extent Dr. Murphy presented evidence of his attempts to cure these breaches, the Court finds that they were untimely and only made after prompting from HIT.

[33]    HIT staff had to spend time checking and following up on violations by Defendants.  The wages or salary of these staff members for hours spent on this work is arguably monetary damages.  However, no evidence of the value of these services was introduced, except for

## III.   SPECIFIC PERFORMANCE & INJUNCTION

### A.   Applicable Legal Standard

Under Texas law, specific performance is an equitable remedy that is normally available only when the complaining party cannot be fully compensated through the legal remedy.   A party seeking specific performance must plead and prove: (1) compliance with the contract, including tender of performance unless excused by the defendant's breach or repudiation; and (2) the readiness, willingness, and ability to perform at relevant times. *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 593-94, 601 (Tex. 2008). Furthermore, contractual rights are enforceable by injunction where exceptional circumstance, such as an inadequate remedy at law and irreparable injury, exist. *Am. Rice, Inc.*, 2006 WL 1984592, at *8 (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 209-10 (Tex. 2002)).

Typically, in order to be entitled to a permanent injunction, a party must demonstrate: "'(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *ITT Educational Servs. v. Arce*, 533 F.3d 342, 348 (5th

---

HIT's attorney, which is discussed below.

Cir. 2008) (quoting *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

When a settlement agreement not to use a trademark is breached, the injury is irreparable and the legal remedy of damages is inadequate due to the continuing injury to the goodwill of the mark.  *See Am. Rice, Inc.*, 2006 WL 1984592, at *8 (awarding permanent injunction where defendant breached settlement agreement not to use plaintiff's trademark); *see also generally Blue Cross and Blue Shield Ass'n v. Am. Express Co*., No. 99-6679, 2005 WL 1838340, at *5–*6 (N.D. Ill. 2005) (finding plaintiff entitled to specific performance and, therefore, an injunction, where settlement agreement requiring ceasing use of plaintiff's trademark was breached).  An injunction is therefore appropriate to enforce a contractual promise not to use a trademark. *Qaddura*, 141 S.W.3d at 891-92 (affirming grant of permanent injunction where evidence indicated non-compliance with settlement agreement requiring non-use of trademark); *see also* 5 T. McCarthy, MᴄCᴀʀᴛʜʏ ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋs § 30.2 (4th ed. 2005) ("The remedy of injunction may also be appropriate in its guise of an order for specific performance of a contract, such as a settlement contract's promise not to use a trademark.").

The Court concludes that HIT is entitled to specific performance and a permanent injunction to enforce the Settlement Agreement.  As indicated above, the Settlement Agreement is a valid and enforceable contract between HIT and Defendants

that HIT performed under and that Defendants repeatedly and flagrantly breached. The Court finds that Defendants did not take adequate affirmative steps to ensure their compliance with the terms of the Settlement Agreement, even after this Court issued its preliminary injunction. The Court finds that monetary damages are inadequate to compensate HIT for Defendants' breaches. Therefore, the Court finds that specific performance is warranted.

Furthermore, the Court finds that HIT was irreparably damaged by Defendants' continued authorized use, and the corresponding dilution, of HIT's trademarks. *See Am. Rice, Inc.*, 2006 WL 1984592, at *8; *see also generally Blue Cross and Blue Shield Ass'n*, 2005 WL 1838340 at *5–*6; *Qaddura*, 141 S.W.3d at 891-92. Defendants are not in HIT's business. Dr. Murphy frequently blogs and takes public positions to which HIT apparently does not subscribe. HIT's public image should not be conflated or overlap with Defendants'. Remedies at law are inadequate to compensate and protect HIT from Defendants' breaches. The balance of hardships favor enjoining Defendants' use of the trademark. HIT has been required to repeatedly search the Internet for Defendants' breaches and to repeatedly notify Defendants' counsel of those breaches before Defendants made any meaningful efforts to comply with the Settlement Agreement. Additionally, Dr. Murphy orally indicated at trial that he has no intent to continue to associate himself with the Helix name. Additionally,

the public interest favors settlement agreements and contracts, generally. When individuals ignore contractual obligations, particularly settlement agreements, the public is disserved. Therefore, the Court finds that a permanent injunction enforcing the terms of the Settlement Agreement also is warranted here.[34]

## IV.    **ATTORNEY'S FEES**

Under Texas Civil Practice & Remedies Code § 38.001(8), a prevailing party is entitled to "reasonable attorney's fees" for prosecuting a successful breach of contract claim, provided the conditions precedent set forth in § 38.002 are satisfied. *See Marre v. United States,* 117 F.3d 297, 309 (5th Cir. 1997) (trial court has no discretion to deny fees if they are proper under § 38.001). To recover attorney's fees for a breach of contract claim, (1) the claimant must be represented by an attorney, (2) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party, and (3) payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented. TEX. CIV. PRAC. REM. CODE § 38.002. Although presentment is a requirement for recovery of attorney's fees, "no particular form of presentment is required and it may be written or oral." *Qaddura*, 141 S.W.3d at 892-93. Furthermore, Texas courts have awarded attorney's fees in the absence of any monetary award. *See, e.g. Rasmusson v. LBC*

---

[34]       This injunction is coterminous with specific performance in this case.

*PetroUnited, Inc.*, 124 S.W.3d 283, 286-87 (Tex.App.—Houston [14th Dist.] 2003, pet. denied); *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 797 (Tex.App.—Houston [14th Dist.] 1986).

The Court finds that HIT complied with these requirements and is entitled to recover attorney's fees.  HIT notified Defendants by letter on February 6, 2010 of their demand for attorney's fees in the amount of $37,240.00.[35]  There is no evidence in the record that any payments were tendered before the expiration of the 30th day after this claim was presented.  Defendants' counsel contended that Plaintiff has failed to timely present the claim in accordance with § 38.002.  Defendants have not supplied legal authority to support this contention under the facts of this case.  As noted, Plaintiff's attorney wrote at least three letters informing counsel of Defendants' breaches of the Settlement Agreement in December, 2009 and demanded payment of his fees on February 6, 2010.  Although these notices were well after suit was filed, they were well before trial and judgment.  State courts have used different approaches as to when presentment for attorney's fees must be made.  *Compare Belew v. Rector*, 202 S.W. 3d 849 (Tex. App.—Eastland 2006, no pet.) (presentment required 30 days before trial); *Stuckey v. White*, 647 S.W. 2d 35 (Tex. App.—Houston [1st Dist.] 1982, no writ) (presentment not required 30 days before filing suit, rather, it is only necessary that

---

[35]      PXs 46, 47.

claim be presented and not paid within 30 days); *Stafford v. Brennan*, 498, S.W.2d 703 (Tex. Civ. App.—Corpus Christi 1973, no writ) (presentment can be before or after filing of suit but must be within 30 days of judgment) *with Caldwell & Hurst v. Myers*, 714 S.W.2d 63, 65 (Tex.App.—Hous. [14th Dist.] 1986) ("Proper presentment is the assertion of a claim and a request for payment made 30 days before initiation of a suit."). *See also Am. Rice, Inc. v. Producers Rice Mill, Inc.*, No. H-05-3227, 2006 WL 1984592, at *3 (S.D. Tex. July 14, 2006) (§ 38.002 satisfied where after filing suit, Plaintiff made reasonable demand that Defendant stop using mark and Defendant did not comply within 30 days). The Court concludes that Plaintiff's December 2009 letters and February 2010 demand are sufficient.  The Court finds that HIT complied with the requirements of Texas law and is entitled to recover attorney's fees.

The trial court, when acting as the factfinder, has discretion to fix the amount of reasonable fees.  *See Marre*, 117 F.3d at 309; *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex.1985) (determination of fees is fact issue and court's finding will not be disturbed absent an abuse of discretion).  In deciding what amount is reasonable, the court can consider the nature and complexity of the case, the amount of time and effort required, the expertise of counsel, and the court's own expertise.  *See Thomas v. Thomas*, 917 S.W.2d 425, 436-37 (Tex. App.—Waco, 1996); *Murrco Agency,  Inc. v. Ryan,* 800 S.W.2d 600, 606-07 (Tex.App.—Dallas 1990, no writ).  In addition, the

award of attorneys' fees must bear some reasonable relationship to the amount in controversy. *See Travelers Ins. Co. v. Brown*, 750 S.W.2d 916, 918-19 (Tex.App.—Amarillo, 1988).

The parties disagree as to the appropriate method for calculating HIT's attorney's fees. HIT argues that the "market rate" is the prevailing manner used to calculate attorney's fees for both outside and in-house counsel, directing the Court's attention to *Central States, Southeast & Areas Pension Fund v. Central Cartage Co.*, 76 F.3d 114, 116-17 (7th Cir. 1996). HIT also argues that the prevailing market rate is $250.00 hour and Plaintiff's counsel asserts that he has spent 252.8 hours on this case.[36] Defendants argue the proper method for determining attorneys' fees for in-house counsel is cost plus overhead, citing *PPG Indus., Inc. v. Celanese Polymer Specialties Co.*, 840 F.2d 1565, 1570 (Fed. Cir. 1988).

Under Texas law, a factfinder should consider the following factors in determining the reasonableness of a fee award:

    (1)    the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

    (2)    the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;

---

[36]    *See* PXs 47, 51.

(3)     the fee customarily charged in the locality for similar legal services;

(4)     the amount involved and the results obtained;

(5)     the time limitations imposed by the client or by the circumstances;

(6)     the nature and length of the professional relationship with the client;

(7)     the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)     whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Arthur Andersen & Co. v. Perry Equipment Corp*., 945 S.W.2d 812, 818-19 (Tex. 1997).

The Court concludes that Plaintiff HIT should be compensated for in-house attorney Scott Weiss's time at cost plus overhead.  *See PPG Indus., Inc.*, 840 F.2d 1565, 1570 (Fed. Cir. 1988)  The number of hours spent by Mr. Weiss was reasonable and necessary.  None of the *Anderson* factors alters the outcome in this case.  The parties appear to have stipulated that under this cost plus overhead method, Mr. Weiss's fees are $15,000 plus $1,600 in expenses incurred for Dr. Murphy's deposition, plus a $350 filing fee.  The Court therefore awards $16,950 in attorney's fees to HIT.

## V.   **DEFENDANTS' COUNTERCLAIM**

In their Second Amended Answer and Counterclaim [Doc. # 28], Defendants allege a cause of action under the Federal Wiretap Act, 18 U.S.C. § 2510 *et seq.* Specifically, they allege that HIT's conduct in "intercepting, reading and/or disseminating Defendants' private electronic mail . . . was without Defendants' consent and constitutes a violation of the Federal Wiretap Act."[37]  Defendants seek actual or statutory damages pursuant to 18 U.S.C. § 2520.[38]

### A.   **Applicable Legal Standard**

Section 2520 of the Federal Wiretap Act, as amended by Title I of the Electronic Communications Privacy Act (ECPA), provides that "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter" may recover civil damages for such violation.  *See* 18 U.S.C. § 2520. Interception of a wire, oral, or electronic communication is a necessary condition for recovery.  *See* 18 U.S.C. § 2511 (prohibiting intercepting communications as well as disclosure and use of intercepted communications); *see also Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*, No. 07-1029, 2007 WL 4394447, at *4 (E.D. Pa. Dec.13, 2007). The Act defines "intercept" as "the aural or other acquisition of the contents of any

---

[37]      Doc. # 28, ¶¶ 20, 21

[38]      *Id.*

wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).  "Electronic communications" are defined by the Act as "any transfer of signs, signals, writing, image, sounds, data or intelligence of any magnetic, photoelectronic or photooptical system . . . ."  18 U.S.C. § 2510(12). E-mails are considered electronic communications for purposes of the Wiretap Act. *See Steve Jackson Games, Inc. v. U.S. Secret Service*, 36 F.3d 457, 461-62 (5th Cir. 1994).

The Fifth Circuit has held that "electronic communications" cannot be "intercepted" for purposes of the Wiretap Act when those communications are in "electronic storage."  *Id.*.  The Act defines "electronic storage" as "(a) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (b) any storage of such communication by an electronic service communication service for purposes of backup protection of such communication."  18 U.S.C. § 2510(17).

Furthermore, "the drive or server on which an e-mail is received does not constitute a device for purposes of the Wiretap Act."  *Ideal Aerosmith, Inc.*, 2007 WL 43944447, at *4.  A person only has standing to assert Wiretap Act claims with respect to communications sent by that person, not with respect to those communications sent

by third parties.  *Id.*  Finally, purchasers of assets can monitor email addresses acquired.  *Id.* at *5-*6.

**B.**  **Analysis**

The facts on which Defendants' counterclaim is based are virtually undisputed. Pursuant to the Settlement Agreement, certain domain names were transferred from Defendants' to HIT's control.  It is undisputed that following HIT's transfer, the account received over 3,500 emails that were sent to or from email addresses associated with "helixhealth.org," one of the domain names transferred from Defendants to HIT.  It is also undisputed that Plaintiff opened six or eight of these emails and sent them to Defendants' counsel as alleged examples of Defendants' ongoing use of the "Helix" name with respect to third-party payors. Defendants argue that HIT violated the Wiretap Act when the "MX Record" associated with the domain name and related email account for "helixhealth.org" was changed to the platform called GoDaddy.com.  The evidence establishes that GoDaddy shut off the old "MX Record" and substituted its default MX Record, a step apparently taken by GoDaddy.com automatically upon taking over an email address.  Defendants contend this change of MX Record was without Defendants' consent and, indeed, was a breach of the Settlement Agreement.

Plaintiff contends that the emails sent to the domain names Defendants transferred by agreement to HIT automatically arrived in HIT's account, and that HIT did not violate the Act because it did not intentionally intercept any electronic communications by GoDaddy.com's administrative act of giving that email account a new "MX Record." Plaintiff further argues that Dr. Murphy breached the Agreement first because he did not provide HIT with a forwarding email address as he was required to do. Paragraph 4 of the Settlement Agreement (the "Rerouting of Email clause") provides:

> Within ten (10) days after receipt of an executed copy of this Agreement by Murphy, Healix in conjunction with Murphy or Helix Health LLC shall take whatever steps are necessary to set up an MX Record to have all emails that are received at helixhealth.org rerouted to Murphy's new email address (to be provided by Murphy). This provision is necessary to prevent any inadvertent disclosure of patient information and violation of HIPA [sic]. Healix also agrees not to set up any email address associated with (or an MX record for the DNS records for) the domains, <helixhealth.org> and <myhelixhealth.com>.

Notably, had Dr. Murphy provided the forwarding email address, the Wiretap Act issue would not have arisen.

The Court need not resolve the issue of which party breached the Rerouting of Email clause. The only issue before the Court is whether HIT's actions give rise to a violation of the Wiretap Act. For two independently sufficient reasons, the Court finds that they do not.

First, HIT did not "intercept" Defendants' emails for purposes of the Wiretap Act.  As the Fifth Circuit makes clear, "electronic communications" cannot be "intercepted" for purposes of the Wiretap Act when those communications are in "electronic storage."  *Steve Jackson Games, Inc.*, 36 F.3d at 461-62.  In *Steve Jackson*, the Court considered whether seizing a computer on which private emails, which had be sent to an electronic bulletin board but not received by their intended recipients, were stored constituted an "intercept" within the meaning of the Wiretap Act.  *Id.* at 460.  The Court held that these emails were in electronic storage and thus could not be intercepted.  *Id.* at 461-62.  This case is similar.  After Defendants transferred the domain name to HIT, Defendants' emails were automatically rerouted to GoDaddy.com servers, where they were stored and available to be read.[39]  Storing emails does not constitute an interception or other Wiretap Act violation.  Also, as to the several emails HIT staff opened after the emails had been stored, there is no interception under the Wiretap Act, and thus no violation because HIT's reading did not occur contemporaneously with either the sending or the receipt of the email.

Second, the drive or server on which an e-mail is received does not constitute a "device" for purposes of the Wiretap Act.  *Ideal Aerosmith, Inc., v. Acutronic USA, Inc.*, No. 07-1029, 2007 WL 4394447, at *4 (E.D.Pa. Dec.13, 2007).  To state a claim

---

[39]    PX 42.

under the Wiretap Act, Defendants were required to allege that a communication was intentionally intercepted through use of a device.  *Id.*; 18 U.S.C. § 2510(5).  In *Ideal*, Acutronic acquired servers previously owned by Carco, and Ideal hired Carco's employees.  These employees then sent emails using the Carco domain name.  These emails were received by the original Carco servers and redirected by Acutronic to its own servers.  Accutronic then read the emails.  The *Ideal* court held that these circumstances did not state a claim for wiretapping because "Acutronic employed no device to acquire these e-mails, but was merely, as [the new] owner of Carco's system, a direct party to the communication."  *Id.* at *5.  That Acutronic was not the intended recipient of the emails did not make its conduct a Wiretap Act violation.  Additionally, the *Ideal* court noted that only senders of communications, not recipients have standing to bring Wiretap Act claims.  The facts in this case are similar.  HIT acquired the domain name "helixhealth.org" from Defendants and had the domain name transferred to GoDaddy.com servers.  Emails sent using the helixhealth.org domain name were thus received into the HIT-owned accounts on GoDaddy.com servers, although directed nominally to Defendants.  The Court concludes that HIT was thus a direct party recipient of these emails and did not commit a Wiretap Act violation.

The Court therefore dismisses Defendants' counterclaim under the Wiretap Act.

## VI.    __CONCLUSION__

For the reasons articulated above, the Court finds (1) that Defendants breached the Settlement Agreement; (2) that HIT is entitled to a permanent injunction to enforce the Settlement Agreement; (3) that HIT is entitled to $16,950 in attorney's fees, and (4) that Defendants' Wiretap Act counterclaim lacks merit and is dismissed.

Final Judgment in favor of HIT will be issued separately.

SIGNED at Houston, Texas, this **30th**day of **September, 2010**.

Nancy F. Atlas
United States District Judge